## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 28 2015, 8:21 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

John T. Wilson
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputies Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of R.W. and E.W.(Minor Children) and M.C. (Mother);

M.C. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 28, 2015

Court of Appeals Case No. 33A01-1505-JT-481

Appeal from the Henry Circuit Court

The Honorable Mary G. Willis, Judge

Trial Court Cause Nos. 33C01-1411-JT-11 and 33C01-1411-JT-12

**May, Judge.**

[1] M.C. ("Mother") appeals the involuntary termination of her parental rights to R.W. and E.W. (collectively, "Children"). As the Department of Child Services presented sufficient evidence termination was in the best interests of Children, we affirm.

## Facts and Procedural History

[2] R.W., born January 20, 2007; and E.W., born January 23, 2010, were born in Maryland. Children's biological father died in 2012. In 2013, Children and Mother moved to Indiana after Mother met and married R.C. ("Stepfather"). On January 30, 2014, DCS filed petitions to adjudicate Children as Child in Need of Services (CHINS) based on an allegation they were exposed to unnecessary medical care, including approximately seventy-eight doctor and emergency room visits in a year. The trial court held an initial hearing on the petitions the same day and removed Children from Mother and Stepfather's home.

[3] The trial court adjudicated Children as CHINS on February 21, 2014, after Mother admitted Children were in need of services. On March 14, 2014, the trial court entered its dispositional decree requiring Mother to participate in reunification services including participation in: home-based counseling and case management; parenting assessment and completion of all recommendations; substance abuse assessment and completion of all recommendations; psychological assessment and completion of all

recommendations; random drug screens; and supervised visitation with Children.

[4] On June 6, 2014, the trial court held a compliance hearing and found while Mother was adequately participating in some reunification services, she was not completing services related to her parental obligations. Around the same time, one of Mother's home-based counselors had to discontinue services. The counselor and Mother were concerned for their safety if Stepfather discovered Mother had disclosed incidents of domestic violence to the therapist.

[5] On October 6, 2014, DCS filed a motion to discontinue reunification services, and Mother contested that request. The trial court held a hearing and found Mother was no longer compliant with reunification services; there was domestic violence between Mother and Stepfather; and Mother was "unable to understand her personality order, . . . [had] pursued inordinate emergency room visits, . . . [was] unable to handle her own medication for her psychiatric concerns and medical care, . . . [and was] unable to adequately manage [Children's] medical care and basic parenting needs." (DCS Ex. 24 at 2.) Children's Court Appointed Special Advocate (CASA) also recommended suspending reunification efforts.

[6] On November 5, 2014, DCS filed petitions to terminate Mother's parental rights to Children. The trial court held a permanency hearing on January 23, 2015, and changed the plan for Children from reunification to adoption and began termination proceedings. The trial court held fact-finding hearings on the

termination petitions on February 4, 2015, and April 7, 2015. The trial court issued an order terminating Mother's parental rights to Children on April 27, 2015.

## Discussion and Decision

[7] We review termination of parental rights with great deference. *In re K.S., D.S., & B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[8] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine first whether the evidence supports the findings and second whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[9] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must subordinate the interests of the parents to those of the child, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own child should not be terminated solely because there is a better home available for the child, *id.*, but parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[10] To terminate a parent-child relationship, the State must allege and prove:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

[11] The trial court's conclusion that termination is the best interests of Children was not error.[1] In determining what is in the best interests of children, the trial court is required to look beyond the factors identified by DCS and to consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). In

---

[1] Mother argues DCS did not prove the conditions that resulted in Children's removal would not be remedied. She does not contest the trial court's findings supporting its conclusion the continuation of the parent-child relationship posed a threat to the well-being of Children. DCS does not have to prove both a reasonable probability the conditions that resulted in Child's removal will not be remedied and a reasonable probability the continuation of the parent-child relationship between Mother and Children posed a threat to the well-being of Children. The statute is written in the disjunctive, and DCS must prove either by clear and convincing evidence. *See* Ind. Code § 31-35-2-4. Therefore, we need not address that argument.

so doing, the trial court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until children are harmed irreversibly before terminating the parent-child relationship. *Id.* Recommendations of the case manager and court-appointed advocate, in addition to evidence the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the children's best interests. *Id.* A parent's historical inability to provide a suitable environment, along with current inability to do the same, supports finding termination of parental rights is in the best interests of the children. *Lang v. Starke Cnty Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied*.

[12] The trial court found:

> 18. Between January 2013 and January 2014, when [R.W.] was in the care of Mother and [Stepfather], [R.W.] visited a doctor 45 times:
>
> > a. Some of these visits included hospitalizations,
> >
> > b. This culminated with an ultimately unnecessary surgery that inserted pins into [R.W.'s] legs, and from which at the time of the fact-finding hearing, [R.W.] was still recovering,
> >
> > c. To contrast the number of visits while in Indiana, [R.W.] only made 27 visits (7 of which were for necessary eye exams) in the first five years of his life in Maryland while he was only under the care of his Mother and biological Father, and

d. While in the care of Mother and [Stepfather], [R.W.] visited medical professionals 18 more times in one year, than he had the entire first five years of his life;

19. [E.W.] also endured excessive medical visits:

a. Between January 2013 and January 2014, when [E.W.] was in the care of Mother and [Stepfather], she visited the doctor 29 times[,]

b. To contrast the number of visits while in Indiana, [E.W.] only made 11 visits in the first three years of her life in Maryland while she was only under the care of her Mother and biological Father, and

c. While in the care of Mother and [Stepfather], [E.W.] visited medical professionals 18 more times in one year, [sic] than she had the entire first three years of her life;

20. The DCS determined [Stepfather] was an unsafe individual to care for the Children;

* * * * *

25. With an exhibited and clear safety risk in the way of [Stepfather] living in the home, DCS did not recommend placing [Children] back with Mother while she was still living with [Stepfather] for the following reasons:

a. [Stepfather] failed to show significant and substantial improvement through the utilization of the services offered to him,

b. [Stepfather] never showed a significant commitment to improvement, let alone actual improvements and the Court authorized the DCS to cease efforts towards reunification with Mother and [Stepfather];

26. Throughout the life of the underlying CHINS matter, Mother remained insistent on living with [Stepfather]:

a. She would state to DCS that she did not understand why she had to choose between her marriage and her children;

b. DCS informed Mother that the only decision she had to make, was that to ensure the safety of her children,

i. This was a topic of conversation and explanation in the many visits between Mother and FCM Amanda Harris discussed earlier in this Order;

c. Mother was also informed by her many service providers that the safety of [Children] could not be ensured while she still lived with [Stepfather], but she never made any significant attempts to live without [Stepfather];

i. This was exhibited most clearly when Mother informed her home-based case worker Heather Morrow that it would be "pointless" to go to a women's shelter because she would always go right back to [Stepfather];

d. On the date of the fact-finding [hearing], Mother was still living with [Stepfather] at a hotel in New Castle, Indiana;

* * * * *

32. The foster placement of the children has since provided support, care, guidance, and supervision in the absence of the same from the Mother for approximately the last six months (and [Children were] in a therapeutic foster home the ten months before that);

33. The Children are bonded with the placement family;

34. The Children are currently doing well in the care of [their] foster family;

35. The foster placement is willing and able to provide a loving, stable home[.]

(App. at 78-84.) Based on these and other findings of fact and evidence to support them from service providers and Mother, the trial court concluded termination was in the best interests of Children. Mother's argument to the contrary is an invitation for us to reweigh the evidence, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses).[2]

---

[2] Mother argues:

> The procedural problems in the CHINS proceedings deprives Mother of her procedural due process with respect to the termination of her parental rights. Here, the Henry County Department of Child Services disregarded its mandate under I.C. 31-34-21-5.5 to provided [sic] reasonable efforts. The DCS failed to provide services that met with requirements of Mother's psychological evaluation. The DCS did not follow through with providing services that were concrete, hands on and repetitive due to Mother's "cognitive impairment and illiteracy." The only thing DCS focused on was Mother

# Conclusion

The DCS provided sufficient evidence termination of Mother's parental rights was in the best interests of Children. Accordingly, we affirm.

Affirmed.

Najam, J., and Riley, J., concur.

---

leaving her husband, and when she was not willing to do that, they [sic] proceeded to terminate her rights.

(Br. of Appellant at 10-11.) These arguments appear to be related to services offered as part of the CHINS adjudication, which we cannot consider as part of a termination appeal. *See In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009) ("failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law").